**CHICAGO CABLE COMMUNICATIONS, South Chicago Cable, Inc., and Communications and Cable of Chicago, Inc., Plaintiffs,**

v.

**CHICAGO CABLE COMMISSION and City of Chicago, a municipal corporation, Defendants.**

No. 87 C 2591.

United States District Court, N.D. Illinois, E.D.

Jan. 21, 1988.

▮

---

James E. Betke, McDermott, Will & Emery, Chicago, Ill., for plaintiffs.

Craig J. Hanson, Joel Stein, Asst. Corp. Counsels, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

The Chicago Cable Commission (the "Commission") regulates cable television ("CATV") services in the City of Chicago. Plaintiffs Chicago Cable Communications, South Chicago Cable, Inc., and Communications and Cable of Chicago, Inc. (collectively, "Chicago Cable TV" or "CCTV"), are

affiliated corporations providing CATV to Chicago residents under franchise agreements with the Commission. The Commission assessed a $60,750 fine against CCTV for violating one of the terms of the Franchise Agreement. In this proceeding, CCTV raises several constitutional, federal statutory, and state law objections to the imposition of the fine. For the following reasons, we affirm the Commission's assessment and enter summary judgment for Defendants, the City of Chicago and the Chicago Cable Commission.

## FACTS

### Local Origination

On February 10, 1982, the Chicago City Council adopted "the Chicago Cable Communications Ordinance" as Chapter 113.1 of the Municipal Code of Chicago ("Chapter 113.1"). Chapter 113.1 provides for the franchising and regulation of CATV systems within Chicago. In 1984 CCTV was awarded the CATV franchise for Areas 1, 4, and 5 of the City.[1] CCTV executed a "Cable Television Franchise Agreement" with the City for each of the areas in which it was awarded the right to provide CATV services (Exh. 15) (hereinafter the "Franchise Agreement").

The Franchise Agreement requires the grantees to produce and program a certain amount of "local origination" (or "L.O.") programming each week.[2] (Id. section 18.) The Franchise Agreement sets forth a joint plan by CCTV and Group W to govern the provision of L.O. programming. (Exh. G, Attachment G1.) The grantees agreed to commit up to $6,000,000 to produce quality L.O. programming for up to fifteen years. They decided that a centralized approach to L.O. programming was best. They agreed to jointly produce one non-alphanumeric (i.e., video) L.O. channel for the entire City

---

1. Chapter 113.1 divided the City into five Areas. CCTV received the franchises for Areas 1, 4, and 5, and a different company, Group W Cable, was awarded the franchises for Areas 2 and 3. CCTV and Group W are often referred to as "Grantees" because the City granted them the CATV franchises.

2. The obligation to transmit local origination programming began on October 2, 1986. During Year 1, the cable companies had to transmit at least nine hours L.O. programming per week. Thereafter, the companies had to increase their L.O. programming so that at least 12 hours per week would be transmitted in year 2; 15 hours in year 3; and 20 hours in year 4 and thereafter.

and to individually provide and program two alphanumeric channels for each franchise area. The grantees agreed that each company would produce one-half of the total original local programming that had to be produced each week. The grantees also agreed to equip a central production studio, a mobile camera and production system (minicam), a post-production (editing) facility, a screening facility, a master control facility, and a central video maintenance facility. (Attachment G1.) The estimated cost of the facilities, equipment, and improvements on the central studio was $1,500,000.

In addition to jointly equipping an L.O. production facility, the grantees agreed to provide the staff necessary to develop and produce programming to fulfill their L.O. requirements. The Franchise Agreement stated that the cable operators would use "substantial efforts ... to utilize and develop local talent for local origination purposes. In addition, the use of full-time and part-time internship programs for local residents should increase the local residents [sic] potential for employment as demand requires." (Attachment G1, ¶ 3.)

### The Chicago Cable Commission's Regulatory Efforts

Chapter 113.1 created within the Mayor's Office a department named the Office of Cable Communications ("OCC"). The head of the OCC bore the title of Cable Administrator (during all the relevant times in this case, the Cable Administrator was Robin Charleston) and also served as the Chairman of the Chicago Cable Commission. Chapter 113.1 created the Commission to regulate the provision of CATV services within the City of Chicago. The Commission is required to hold open meetings at least once a month and to act as an inter-

mediary between the subscribing public and the cable operators. The Commission's most important function, as far as we are concerned for this case, is the enforcement of the terms of Chapter 113.1 and the Franchise Agreements against the cable companies.

The Commission began active regulation and supervision of L.O. in the summer of 1986. (Exh. 14, Letters of June 5, 1986, and July 25, 1986).[3] That was the time during which CCTV and Group W began seriously preparing for the oncoming October 2, 1986, start-up date for L.O. programming.

The Commission first listed "Local Origination" on the agenda for its monthly meeting in July 1986. (Exh. 7, pp. 4, 112–143.) At the July meeting, representatives of Group W and CCTV/TCI[4] described their L.O. preparation efforts to date. These efforts included hiring employees, contacting community organizations for ideas for possible L.O. programming, contacting area schools for interns, and so on. (*Id.* at 114–116.) Group W described the studio and production facility it was building at its headend location.[5] (*Id.* at 117–121.) The Commission members inquired at great length regarding the kinds of L.O. programming the cable operators were planning to transmit to their customers. Suggestions were made regarding foreign language programming (Polish, Lithuanian, Spanish, Vietnamese, etc.), for example. (*Id.* at 116, 136.) In that vein, Commissioner Delgado stated:

> LO doesn't necessarily have to be for not-for-profit purposes, an example being if you were to take the format of *Chicago Magazine,* which is a ... local magazine that deals with the local restaurants, parks, community events, festivals, politics, anything that has to do with the

3. All of the relevant correspondence between the grantees and the Commission, and all of the intra-Commission memoranda are included in the record as Exhibit 14. We shall identify the documents by the dates stated on the face of the document or with a brief description if needed.

4. The Committee and the parties often refer to Plaintiffs as "TCI" in addition to "Chicago Cable TV." The three affiliated corporations which

comprise "Chicago Cable TV" are subsidiaries of a Denver-based corporation named Telecommunications, Inc. Hence, the record at times refers to Plaintiffs as TCI.

5. The headend location is the place from where cable signals are transmitted to the cable company's subscribers.

metropolitan Chicago area, and so that LO would be used to cover those areas that have a local impact.

(*Id.* at 138–139.)

After the July Commission meeting, Robin Charleston wrote to Group W and CCTV requesting the submission of monthly reports on L.O. (Exh. 14, Letter of July 25, 1986.) In August, Group W responded on behalf of itself and CCTV. (Exh. 14, Letter of August 7, 1986.) In their report, Group W described the ongoing renovation of a central studio to be used by all the grantees, and the renovation of a smaller facility at Group W's headend location for use by the Area 2 and 3 franchisees. (*Id.*) Group W also reported that "Chicago Cable TV is presently considering contracting its program production efforts to a third party who would supply all necessary production manpower." (*Id.*, p. 2.)

On September 5, 1986, Group W (again on behalf of itself and CCTV) submitted its monthly L.O. report for September. (Exh. 14, Letter of September 5, 1986.) This report mostly discussed Group W's L.O. efforts, but reiterated that CCTV "is presently engaged in discussions with third parties regarding the provision of similar production services to generate local origination programming for Areas 4 and 5." (*Id.*) The report also provided a description of some of the programs Group W produced and planned to use to fulfill its L.O. obligations.[6]

On October 2, 1986, the grantees began transmitting nine hours of L.O. programming per week to their subscribers in Chicago. At the October Commission meeting, the Commission congratulated the grantees on commencing local origination programming on schedule on October 2. (Exh. 8, pp. 116–117.)[7]

At the November Commission meeting (on November 12, 1986), Michael Green appeared on behalf of CCTV. (*See* Exh. 9.) Although Mr. Green had been hired as CCTV's general manager the previous day, he appeared at the monthly meeting on behalf of CCTV. At the meeting, the Commission inquired as to the source of some of CCTV's L.O. programming. Ms. Charleston stated:

Well, my understanding of what is going on in Area 5 with local origination is that Group W local origination programming is being shown in Area 5, and some of what Chicago Cable TV says is local origination originated by it is shown in Area 5, and that I understand to be Cablenet[8] programming, programming from another system entirely.

And, as I said, this is information that I have gotten orally, you know, from being out at the headend, and ... I do hope ... that can be straightened out by written submissions as to what is being shown, because that is a concern[.]

(Exh. 9, p. 129.)

In response, Mr. Green initiated the following colloquy:

MR. GREEN: ... And I guess the only other thing, for the record, I concur. And I was in attendance at a meeting, at a brief meeting with the Chairman, concerning the L.O. and where the programming comes from.

And I just want to go on the record for saying that as far as I am concerned, it should be local City of Chicago programming.

---

**6.** The list of Group W's L.O. programs included "Prep Game of the Week," "Prep Talk" (a sports talk show), "At the Top" (interviews with people from the Chicago area), "Sig's Celebrity Chefs" (a cooking show with Chicago entertainers), "Best of the Fests," and an unnamed Polish-language Catholic Mass.

**7.** CCTV did have some difficulty transmitting L.O. programming to Area 5. CCTV encountered difficulty in getting zoning approval to build a microwave relay tower at the Area 5 headend. CCTV did not receive zoning approval and a construction permit until about December 1, 1986 and could not begin construction until then. (Exh. 14, Letter of December 2, 1986.) The tower was completed December 12, 1986 (*Id.*, Letter of December 19, 1986). From November 7 through December 12, CCTV used playback equipment at its Area 5 headend to transmit L.O. programming to its Area 5 subscribers. (*Id.*, Letter of November 7, 1986).

**8.** Cablenet is a CATV operator in the northwest suburbs of Chicago and is an affiliate of CCTV. Cablenet has its main offices in Mt. Prospect, Illinois.

CHAIRMAN CHARLESTON: That's real important.

MR. GREEN: And that's what we intend to do.

CHAIRMAN CHARLESTON: I really appreciate that.

*Id.* at 131.

A few days later, Mr. Green wrote to Ms. Charleston, further explaining CCTV's position on L.O. (Exh. 14, Letter of November 17, 1986):

> The concerns expressed by you and the Commissioners at the last Commission meeting have prompted us to reevaluate our approach to local origination programming. We are currently establishing an internal plan for L.O. and soon will be approaching outside sources for their input.
>
> Roughly our L.O. program will involve contracting with several companies who have either the necessary equipment or the production talent that is needed. We hope to approach local producers' associations and minority producers to establish a base of production talent.
>
> We will supply you with more details and a clear time frame when we have solidified some of our ideas. Any suggestions the Commission may have are greatly appreciated.
>
> It is important to note that the local origination programming which is currently aired on our L.O. channel does comply with Section 18 and Exhibit G of the franchise agreement. However, we agree with the Commission that local origination programming would be more effective if it were produced by Chicago producers on Chicago subjects.

CCTV's December L.O. report listed and described the L.O. programming it was airing. (*Id.*, Letter of December 4, 1986.)[9] At the Commission's December meeting (Exh. 10), the topic of L.O. was discussed only briefly. Group W showed a videotape containing a sample of its L.O. programming to the Commissioners, and the Group W representative stated that CCTV's L.O. programming was similar. (*Id.* at 29.) Ms. Charleston lauded the programming, calling it a "spectacular production." (*Id.*) The Commission noted that CCTV's monthly report on L.O. was less graphic than Group W's report and asked for a sample of CCTV's L.O. programming in the near future. (Exh. 10, p. 36.) No discussion of the source or content of CCTV's L.O. programming occurred.

### Imposition of Sanctions

At the next Commission meeting, on January 13, 1987 (Exh. 11), Ms. Charleston requested authorization to issue a Notice of Violation against CCTV regarding its L.O. programming.[10] There were five reasons cited by Ms. Charleston for believing CCTV was in violation:

---

**9.** CCTV's December report listed seven programs and a summary of their content: "Traveling Fare" (presents restaurant reviews and recipes); "Smart Money" (discussion of personal finance and investments); "Positively Single" (presents topics of interest to single adults); "Lights on Chicago" (covers activities, personalities and events prominent in Chicago); "Sometimes Live" (a comedy and improvisation show); "Illinois Reads" (presents interviews with authors); and "Grassroots" (a roundtable political discussion). In January, CCTV began telecasting two other L.O. programs: "Chuck Schaden's Nostalgia" (a look at the Chicago area's cultural past) and "The Pulse" (features rock bands from the Chicago area).

**10.** Section 29 of the Franchise Agreement sets forth the procedure by which the Commission may enforce the terms of the agreement. The first step in any enforcement proceeding is the issuance of a notice of violation. "If the Commission has reason to believe that Grantee is in violation of [this Agreement], the Commission shall notify Grantee in writing of the violation setting forth the nature of such violation." Franchise Agreement, sec. 29.2. The Grantee then has 30 days (or less if the Commission determines the violation is so serious that a shorter time period is warranted) to either remedy the violation or to respond in writing contesting the notice of violation with supporting documentation indicating either that the violation did not occur or it was beyond the Grantee's control, and requesting an opportunity to be heard. (*Id.*) If after contesting the violation, the Grantee fails to prove a violation did not occur, the Commission may penalize the Grantee. (*Id.*, sec. 29.3.) The Commission may fine the Grantee up to $750 per day per violation (sec. 29.6), and must notify the Grantee of such violation and fine by issuing a Notice of Assessment. (Sec. 29.3.)

1. CCTV has not demonstrated how their current programming is actually local origination in that it is actually locally produced (within the City of Chicago) and is solely under the control of TCI.

2. CCTV has not provided documentation on the provision of one full-time non-alphanumeric channel and two alphanumeric channels in each Area.

3. No documentation of efforts to establish internship programs for local residents and ongoing relationships with local schools.

4. CCTV has not documented its share of the nine hours required weekly in Year 1 for L.O. programming.

5. No documentation or proof of joint participation with other area grantees in centralized L.O. studio and mobile equipment has been provided by CCTV.

(Exh. 2, pp. 3–4.)

During the Commission's discussion of whether to issue the notice of violation, Commissioner Hubbard expressed her surprise at the Chairman's request for issuance of a notice of violation because she thought CCTV had not been asked to provide further information on its L.O. programming at the last meeting when CCTV presented its L.O. report. (Exh. 11, p. 128.) In response, the Chairman stated that there was correspondence to CCTV, that the Commission did discuss CCTV's earlier problems with Area 5 (*see* n. 7, *supra*, and accompanying discussion), and "I have always expressed great reservations and dissatisfactions about Chicago Cable TV's local origination requirements." (Exh. 11, pp. 128–129.) After further discussion during which Commissioner Hubbard reiterated her concerns about the procedures being used (*id.* at 130–133), Chairman Charleston stated, "I don't think the cable company is being caught by surprise that it is not in compliance. In fact, I am positive the cable company knows that it's not in in

compliance." (*Id.* at 133.) The Commission then voted to issue the notice of violation and to give CCTV fifteen days to respond to the notice. (*Id.* at 140–141; see Exh. 2.)

CCTV's response to the notice of violation (Exh. 14, Letter of January 29, 1987) asserted CCTV's belief that it was fulfilling all its L.O. obligations. Specifically, CCTV stated that of the nine hours L.O. programming per week, 4.5 hours came from Group W, and 4.5 hours was acquired from their affiliated TCI companies in the surrounding suburban area.[11] CCTV further stated that it selected shows from the pool of available suburban L.O. programming it believed would be of interest to its customers in Chicago. (*Id.*) A list of all the L.O. programming presented by CCTV since October 1, 1986 was attached. (*See* n. 9, *supra.*)

At the next Commission meeting on February 10, 1987 (Exh. 12), Ms. Charleston recommended the Commission find CCTV in violation of the Franchise Agreement and impose a fine. (*Id.* at 7.) The Commission heard statements from Diane Minor, an OCC staff member. Ms. Minor testified that the OCC had formulated a formal definition of L.O. (*see* Exh. 14, Memorandum entitled "What is Local Origination," undated). The OCC borrowed the definition of L.O. used by the National Cable Television Association, i.e., "programming ... which is developed by an individual cable television system specifically for the community it serves." (Exh. 12, p. 8.) The OCC concluded that although Chicago Cable TV/TCI had provided programming produced by Cablenet, an affiliated TCI company in the Chicagoland area, and utilized guests associated with Chicago businesses and institutions, programming had not been produced or telecasted featuring local residents from Areas 1, 4 and 5. (Memorandum, p. 2; Exh. 12, pp. 9–10.) Later in her testimony, Ms. Minor, responding to questions regarding the source of

---

**11.** CCTV and Group W had agreed that each company would produce one-half of the required L.O. programming. Each would then transmit the other's L.O. programming to its subscribers along with its own programming to fulfill their L.O. obligations. The Commission found this plan satisfactory.

CCTV's programming and the subjects of that programming, stated that CCTV produced its L.O. programs in the studios of one of its affiliates in the Chicago suburbs, and "have utilized Chicago personalities, people connected with Chicago institutions, but Chicagowide, like Roosevelt University or Northern Trust Bank; but not necessarily community residents themselves." (Exh. 12, pp. 11–12.)

Mr. Green, on behalf of CCTV, stated that CCTV "still feel[s] that we are in compliance of what is required by the franchise pertaining to local origination.... That is my total response." (*Id.* at 17.)

The Committee then voted to find a violation and to assess CCTV a fine of $750 per day per Area. The notice of assessment stated in part:

THE CHICAGO CABLE COMMISSION FINDS AS FOLLOWS:

1. Based on the submission by CCTV/TCI, the programming shown over CCTV/TCI's local origination channels and claimed by CCTV/TCI to satisfy its local origination obligations as Grantees for Areas 1, 4, and 5 "is acquired through [CCTV/TCI's] affiliated TCI companies in the surrounding Chicagoland area" instead of being produced by CCTV/TCI itself. Furthermore, based on the submission by CCTV/TCI, the subjects of the programming are, for the most part, geared to the broad City-suburban Chicagoland areas rather than the communities that CCTV/TCI serves.

(Exh. 3, p. 1.)

This finding was the basis of the Commission's ruling that CCTV was in violation of its L.O. obligations. (*Id.* at p. 2.) CCTV then filed a petition for reconsideration seeking rescission of the notices of violation and assessment. (Exh. 14, Letter of February 24, 1987.) CCTV raised numerous legal challenges to the assessment. First, it claimed that the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 *et seq.* ("Cable Act") prohibits local authorities from mandating how an L.O. channel can be operated. Second, it claimed that the First Amendment prohibits local authorities from regulating the content of local origination programming. Third, CCTV argued that the term "local origination" in the Franchise Agreement is ambiguous and the Committee's definition cannot be the basis for a fine or penalty. Fourth, CCTV claimed it was in compliance with the Franchise Agreement. And finally, the company claimed it had remedied the alleged violation because it had stopped using programming produced by an affiliate in the suburbs and that it had begun producing all of its L.O. programming within the Chicago city limits. (Exh. 14, Letters of February 24, 1987 and March 9, 1987.)

The Chairman requested proof that CCTV had begun producing all its L.O. programming within the City of Chicago. (*Id.*, Letter of March 4, 1987.) CCTV responded that it and Group W had jointly agreed that Group W would perform all the programming productions on behalf of both companies with the two companies sharing the costs. (*Id.*, Letter of March 6, 1987.) Both companies would have equal input into decisions regarding programming content, use and development of local talent, use of interns, and relationships with various schools in the community. (*Id.*)

The Committee spent most of its March meeting considering the subject of L.O. and CCTV's petition for reconsideration. (Exh. 13, pp. 21–205.) CCTV argued its position that the Commission's actions really were attempts to regulate the content of their L.O. programming, and that such regulation is impermissible under the First Amendment. (*Id.* at 37–39.) The company objected to the Commission's definition of L.O. and the way they came up with it (*id.* at 42–45), but agreed to comply with it in the future. (*See, e.g., id.* at 69.)

Chairman Charleston expressed her opinion the Commission's regulations and rules were valid, that CCTV had indeed violated the L.O. requirements of the Franchise Agreement, and that CCTV was still in violation despite its agreement with Group W to produce L.O. programming within Chicago. (*Id.* at 104–115; 175–176; Exh. 14, Memoranda dated March 4, 1987, and

March 10, 1987). After long debate and arguments from all sides, the Commission voted to deny the petition to reconsider (Exh. 13 at 137–138) and assessed fines amounting to $60,750 ($750 per day, for 27 days (January 15 to February 11, 1987) times three Areas). (*Id.* at 150.) The Commission also decided, over the Chairman's objections, that CCTV had remedied the violation and found the arrangement with Group W adequate. (*Id.* at 199–201.) This action brought by CCTV seeks restitution of the $60,750 fine levied by the Commission.

## LEGAL DISCUSSION

CCTV raises several arguments in support of its motion seeking reversal of the order of the Commission assessing a fine of $60,750. Before we can address any of these arguments, we must first understand precisely what the Commission did. The Commission sanctioned CCTV on the basis of three findings: The programs used by CCTV to fulfill its L.O. obligations were (1) produced by an affiliate company (2) in a suburban location and (3) were geared to the broad metropolitan area rather than the City alone. Paragraph 1 of the notice of violation, the Commission's discussions, and the Commission's findings and assessments all concerned these three issues. Accordingly, we will examine the record to see if it supports the Commission's finding that CCTV in fact produced its L.O. programs in Cablenet's suburban studio regarding the metropolitan area rather than the City, and we will examine the law to see if the Commission may legally impose a fine on CCTV for producing such L.O. programming.

### 1. *Sufficiency of the Evidence*

■ Our examination of the sufficiency of the evidence need not detain us long. CCTV admitted that it was acquiring its 4.5

hours of L.O. programming from Cablenet. (Exh. 14, Response to Notice of Violation, ¶ 1.) CCTV admitted that the programs were produced in Mt. Prospect. (Exh. 13, pp. 35–36.) And the descriptions of CCTV's L.O. shows provided by CCTV indicate a broader appeal than simply the City of Chicago. (Exh. 14, Response to Notice of Violation.) For example, the show "Illinois Reads" presents authors from throughout the State of Illinois. While this show may be of interest to some Chicago cable customers, it clearly is not focused on Chicago.[12] This is enough evidence to support the Commission's findings. The tougher question is whether the Commission may legally impose the fines.

### 2. *Franchise Agreement*

CCTV argues that the Commission's finding of a violation on the ground CCTV acquired L.O. programming from a third party (here Cablenet) conflicts with the Franchise Agreement. Attachment G1 to the Franchise Agreement provides "local origination falls solely under the control of the cable operator and/or its contractors." The Commission implicitly concedes that the grantees can hire third parties to produce their L.O. programming (or at least the Commission does not now attempt to support its finding to the contrary). (Brief in Opposition, p. 17.) Since the Commission does not rely on CCTV's use of Cablenet for production purposes in its attempt to bolster its case, neither shall we. We shall proceed to examine the legality of the two remaining bases for the fine: the production outside the City and the fact the shows were geared to the broad metropolitan area.

■ CCTV asserts that the Franchise Agreement does not require that the L.O. programming be "geared" to the City or specific communities within the City. The Commission interpreted the Franchise

12. CCTV claims there is no evidence in the record that any of the Commissioners had ever viewed any of CCTV's L.O. programming. It argues that if the Commission never saw any of CCTV's L.O. programming, they could not rationally have found the subjects geared to the broad City/Suburban areas rather than the City

itself. The flaw in this argument is that CCTV was asked to provide copies of its L.O. programs (Exh. 9, p. 131), but it failed to do so. Even after a notice of violation, CCTV merely sent written descriptions of its programming to the Commission. If the Commission did not view CCTV's L.O. shows, it was solely CCTV's fault.

Agreement to require the content of CCTV's L.O. programming be specifically geared to City residents as opposed to suburban residents. We think the Commission's interpretation of the "local origination" requirement is a reasonable one and we see no error in applying it. Perhaps the procedure by which the Commission went about devising their interpretation of "local origination" was flawed (a contention we consider, *infra*), but we cannot say the Commission's definition is contrary to either the Franchise Agreement or Chapter 113.1. Therefore, we find no basis in the Franchise Agreement to overrule the Commission's interpretation.

■ The next argument CCTV makes based on the Franchise Agreement is that the Commission violated the Franchise Agreement by giving CCTV only 15 days to respond to the notice of violation. Section 29.2 allows the Commission to shorten the response period (normally 30 days) if it determines the violation is of such a serious nature that a shorter period is warranted. CCTV claims there is no evidence in the record supporting a determination that the violation was serious.

At the January meeting (the one at which the notice of violation was issued) the Commission found the violation sufficiently serious to warrant a shortened response time. Ms. Charleston stated that the obligation to telecast L.O. programming began in October 1986, and since CCTV had been in violation since that time, it was necessary to hurry the enforcement proceedings along. (Exh. 11, pp. 131, 136.) The shorter time period was also necessary to ensure that the Commissioners had enough time to review CCTV's submission in response before the next monthly meeting. (*Id.* at 132.) In any event, CCTV neither objected to the shortened response period nor requested an extension of time while before the Commission. In general, issues or defenses not presented in an administrative hearing may not be raised for the first time on appeal. *Village of Hillside v. John Sexton Sand & Gravel Corp.*, 113 Ill.App.3d 807, 69 Ill.Dec. 612, 447 N.E. 2d 1047 (1st Dist.1983); *Rackow v. Illinois*

*Human Rights Commission*, 152 Ill.App. 3d 1046, 105 Ill.Dec. 826, 504 N.E.2d 1344 (2d Dist.1987). Hence, any violation of the time-to-respond provision of the Franchise Agreement (and we expressly do not find such a violation occurred) has been waived.

■ The final argument CCTV raises regarding a violation of the Franchise Agreement is that the amount of the fine is excessive. The Franchise Agreement establishes that the Commission may assess monetary sanctions up to $750 per day for violating any term of Chapter 113.1 or the Franchise Agreement. (Section 29.6.) The Franchise Agreement sets forth three principles which the Commission shall consider in determining the appropriate amount of such sanctions:

a) Such monetary penalties, fines and other monetary sanctions shall exceed the financial benefits to Grantee's delaying or failing to comply with the applicable requirement;

b) Even where such benefits are not easily discernible, such monetary penalties, fines and other monetary sanctions shall be high enough to have a significant deterrent effect on Grantee;

c) Such monetary penalties, fines and other monetary sanctions shall be sufficient to protect the City and other affected parties against loss of revenue resulting from Grantee's violations.

*Id.*

CCTV argues that the Commission failed to consider the monetary savings or the deterrent effect of the fine. We conclude the record adequately supports the Commission's imposition of the maximum fine. At the Commission's February 1987 meeting, the Commission voted to find a violation and assess a fine. When the issue of the appropriate amount of the fine arose, Commissioner Jones stated:

Well, owing to the evident position taken by the respondent that they propose no changes in their attempts to comply, I would suggest that and move that the maximum fine of $750 a day be imposed.

Exh. 12, p. 26. Commissioner Delgado seconded that motion. (*Id.*) Clearly, the Commissioners were concerned that a lesser fine would provide no incentive for CCTV to comply with the Commission's orders promptly.[13] While the discussion was abbreviated, it is sufficient to demonstrate the Commissioners were not arbitrarily imposing the maximum penalty.

### 3. *First Amendment*

■ CCTV next asserts that the Commission's imposition of a fine based on the subject matter of its L.O. programming (i.e., it was geared to the broad City/Suburban metropolitan area rather than the community served by the cable operator) violated the First Amendment. Relying on *Quincy Cable TV v. F.C.C.*, 768 F.2d 1434 (D.C.Cir.1985), *cert. denied sub. nom., N.A.B. v. Quincy Cable TV, Inc.*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986) and *Preferred Communications, Inc. v. City of Los Angeles*, 754 F.2d 1396 (9th Cir.1985), *aff'd and remanded*, 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986), CCTV argues that the City's examination of the subject matter which CCTV, in the exercise of its editorial discretion, chose as its L.O. programming constituted impermissible content regulation. CCTV views the Commission's actions as violative of the First Amendment just as clearly as if the City imposed a fine on the *Chicago Tribune* for printing articles of which it did not approve. (*See Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).)

The Commission, on the other hand, disputes CCTV's contention that it required the cable operator to produce L.O. programming only on subjects the Commission decreed appropriate. To the contrary, the Commission argues it merely determined that CCTV's L.O. programming should relate to local (i.e., Chicago) subjects. This, the Commission concludes, is wholly permissible under the First Amendment.

There is no doubt that cable operators engage in conduct which implicates First Amendment issues. *Preferred Communications*, 106 S.Ct. at 2037; *Quincy Cable*, 768 F.2d at 1444. The strength of that protection is open to some debate. Different communications media are treated differently for First Amendment purposes. *Preferred Communications*, 106 S.Ct. at 2038 (Blackmun, J., concurring). Government regulation of newspapers is extremely suspect, *see Miami Herald, supra*, while government regulation of broadcasters is more readily tolerated. *See Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The Supreme Court has not yet determined the appropriate standard for review for a First Amendment challenge of government regulation of cable television. *See Preferred Communications*, 106 S.Ct. at 2038 (Blackmun, J., concurring).

The lower courts have reached varying results in determining the degree of First Amendment protection to be accorded cable television operators. Some courts have held that cable broadcasting is very different from newspaper publishing where very little government regulation is constitutionally permissible. *E.g., Community Communications Co., Inc. v. City of Boulder*, 660 F.2d 1370 (10th Cir.1981), *cert. dismissed*, 457 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982). Other courts have determined that cable television is quite distinct from the broadcast media, where substantially more government regulation is constitutionally permissible. *E.g., Quincy Cable, supra.* When the Supreme Court eventually decides this issue, it probably will adopt an intermediate approach. It probably will recognize that the strict limits placed on the broadcast media by the physical constraints of the electromagnetic spectrum do not exist in the realm of cable television. *Quincy Cable*, 768 F.2d at 1448. On the other hand, the Court will probably recognize that, at least in some instances, cable television possesses natural monopoly characteristics that warrants greater governmental regulation. *See*

---

**13.** CCTV makes much of the fact that the total fine amounted to $60,750. However, it must be remembered that the fine was $20,250 *per area.* The only reason the fine was so large was because CCTV received the CATV franchise for three of the five areas of the City.

*Omega Satellite Products Co. v. City of Indianapolis,* 694 F.2d 119, 127–128 (7th Cir.1982).

■ We conclude that the appropriate framework for analysis in this case is provided by *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968):

> a government regulation is sufficiently justified (1) if it is within the constitutional power of the Government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*See Erie Telecommunications, Inc. v. City of Erie, Pa.,* 659 F.Supp. 580, 599–600 (W.D.Pa.1987); *Berkshire Cablevision of Rhode Island, Inc. v. Burke,* 571 F.Supp. 976 (D.R.I.1983).

CCTV seems to focus its argument on the second and fourth elements of the *O'Brien* test and so shall we.[14] CCTV argues there is no important or substantial governmental interest furthered by the Commission's regulation of the content of the L.O. programming. CCTV argues that the disruptive and aesthetic concerns enunciated in *Omega Satellite*[15] are not implicated here. This may be true, but the Commission articulates other governmental

interests. The Commission argues the L.O. requirement provides an outlet for community expression and increases the public's choice of programming. (Response Brief at 23.) In addition, Chapter 113.1 states that the development of cable television in general is a means for improving communications between and among the citizens and public institutions of the City, and serves as a vehicle for the participation of all segments of the City, including minorities, in the economic opportunities created by cable television operations. § 113.1–2.[16] Even the Court in *Quincy Cable* recognized "the common wisdom that the goal of encouraging 'localism' qualifies as 'important or substantial.'" 768 F.2d at 1454. The important qualities embodied in the term "localism" (community pride, cultural diversity, etc.) may not be furthered enough simply by the availability of local broadcast television stations for retransmission over cable systems, but may require original cable programming specifically concerning the locality and directed at that locality's residents. The Commission's L.O. requirement helps foster those interests by insisting that those cable companies operating within the City of Chicago produce their L.O. programming within the City of Chicago and designed specifically for City residents. Therefore, we find the Commission's L.O. regulation furthers important and substantial governmental interests.

**14.** The first requirement, that the government possess the power to regulate cable television, is satisfied. The cable television medium has not historically been insulated from regulation, as has the newspaper industry. *Erie,* 659 F.Supp. at 600 and cases cited therein. The third requirement, that the governmental regulation be unrelated to the suppression of free speech, is also satisfied. There is no evidence in the record, nor any argument from CCTV, that the Commission is trying or desires to suppress CCTV's rights of free expression. The Commission merely wants CCTV's L.O. programming to concern Chicago, and only Chicago.

**15.** In *Omega Satellite,* the Seventh Circuit held that a municipality may regulate entry into the cable television market because cable television signals are transmitted through coaxial cable strung along telephone poles and through underground ducts. Because a municipality clear-

ly has an interest in maintaining the aesthetic purity of its territory (*see Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981)), a municipality may limit the number of wires traversing the telephone poles within its boundaries. Similarly, a municipality may regulate the construction of new cable systems which inevitably results in ripping up streets or lawns.

**16.** The Commission's insistence that all L.O. programming be produced within the City of Chicago directly fosters this interest. City residents are more apt to participate in L.O. programming, and to take an interest in that programming, if the shows are produced in the City. Production within the City will provide jobs for City residents (even if the number is small) and will provide opportunities for students studying television and radio broadcasting to gain experience through internship programs.

The final element of the *O'Brien* test is that the government regulation be an incidental restriction no greater than is essential to the furtherance of that interest. We find this element is satisfied. The Commission does not require CCTV to transmit across its cable system any particular editorial viewpoint, any particular show, or even any particular kind of show. Hence, the Commission's rule is both viewpoint and content neutral. CCTV may telecast any program, whether it be sports, entertainment, politics, or whatever, so long as it relates to Chicago. Contrary to CCTV's assertion, this rule does not divest CCTV of programming control; it merely places a minor restriction on the exercise of that control.

CCTV's argument that its L.O. programming is or should be subject to no control is simply wrong. Even before the Commission clarified the meaning of "local origination," CCTV was subject to constraints like the ones it now challenges. If CCTV were to have telecasted programming that originated in Denver in fulfillment of its L.O. obligations in Chicago, it could not have successfully objected on the grounds of "content regulation" when the Commission imposed sanctions. Yet the Commission would be imposing sanctions based on the content of the L.O. programming just as surely as it is here. (Of course, no one would claim that a program featuring skiing in the Rocky Mountains should satisfy a Chicago cable operator's L.O. requirements, so that case is much easier.) The ruling by the Commission here regulates content to no greater extent than if it ruled Rocky Mountains ski shows do not satisfy CCTV's L.O. obligations. The difference is merely one of degree—here the Commission drew a bright line at the Chicago city limits. We find the requirement that CCTV's L.O. programming focus on Chicago and not the suburbs is not an impermissible content regulation.

*4. Cable Act*

■ Congress passed the Cable Communications Policy Act of 1984, Pub.L. 98–549, 98 Stat. 2780, in part to establish a national policy concerning cable communications and to establish guidelines for the exercise of federal, state and local authority with respect to the regulation of cable systems. Cable Act sec. 601, 47 U.S.C. § 521(1), (3). Section 624 of the Cable Act, 47 U.S.C. § 544, governs the regulation of services, facilities, and equipment. The relevant portion provides as follows:

> In the case of any franchise in effect on the effective date of this subchapter [60 days after October 30, 1984], the franchising authority may, subject to section 545 of this title [concerning modification of franchise obligations], enforce requirements contained within the franchise for the provision of services, facilities, and equipment, whether or not related to the establishment or operation of a cable system.

47 U.S.C. § 544(c). Section 544(c) is limited by section 544(f), which provides that "[a]ny Federal agency, State, or franchising authority may not impose requirements regarding the provision or content of cable services, except as expressly provided in this subchapter." The Cable Act further provides that a franchising authority "may enforce any requirement contained within the franchise ... for broad categories of video programming or other services." 47 U.S.C. § 544(b)(2)(B).

CCTV argues that the Commission's requirement that CCTV's L.O. programming be "geared to ... communities that CCTV/TCI services" is neither contained within the franchise nor is a regulation concerning a broad category of video programming. We reject CCTV's arguments.

As we held earlier in this opinion, the Commission's definition of "local origination" was a reasonable one. We thus interpret the Franchise Agreement as requiring L.O. programming geared to the specific community served by CCTV, or to the City of Chicago rather than the metropolitan area. Our interpretation of the Franchise Agreement therefore necessarily defeats CCTV's argument; the requirement of local City of Chicago programming is "contained within the franchise" and may be enforced by the Commission.

CCTV's second argument is more difficult. We have found no judicial decision discussing the meaning of "broad categories of video programming." CCTV argues that the Commission's requirements violates the Cable Act because it is specific content regulation of programming. We agree with CCTV that specific regulation of the content of cable programming would violate the Cable Act. So if the Commission insisted that CCTV cover the Taste of Chicago (an annual gastronomic festival) or the Prep Bowl (an annual high school football game between the best Public League team and the best Catholic League team), for example, we probably would have to conclude that the Commission overstepped its authority.

However, the Commission's actions were not nearly so intrusive. The Commission merely ordered that CCTV present programming on topics specifically relating to the City of Chicago rather than the whole Chicagoland area. The legislative history of the Cable Act indicates that Congress intended the phrase "broad categories of video programming" to mean programming such as "children's programming; programming in a particular foreign language; programming which is primary interest to a particular minority group; news and public affairs programming; [or] sports programming." H.Rep. No. 934, 98th Cong., 2d Sess., pp. 68–69, *reprinted in* 1984 U.S. Code Cong. & Admin.News 4655, 4705–06. If a franchising authority may, consistent with the Cable Act, insist on programming of particular interest to a specific minority group, then surely a franchising authority may insist on programming with less constraints, i.e., programming of interest to a city or a portion of that city. Accordingly, we find no violation of the Cable Act occurred when the Commission fined CCTV for not programming L.O. shows produced especially for residents of the City.

5. *Due Process*

 CCTV next argues that its due process rights were violated because the Commission failed to give adequate notice of a violation. It is axiomatic that a governmental entity must give a person ade-

quate notice prior to deprivation of life, liberty, or property. *See, e.g., Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). A notice is adequate if it apprises the affected individual of, and permits adequate preparation for, an impending hearing. *Memphis Light, Gas and Water Division v. Craft,* 436 U.S. 1, 13, 98 S.Ct. 1554, 1562, 56 L.Ed.2d 30 (1978), *quoting Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). We find the notice given to CCTV was adequate to apprise them of the nature of the violation with which they were being charged.

The notice of violation stated that CCTV had failed to document how its L.O. programming was actually locally produced. While this notice did not define "locally produced," CCTV knew or should have known that the Commission wanted documentation indicating that CCTV produced its L.O. programming within the City of Chicago. *See* Exh. 9 at pp. 129–131. Mr. Green personally acknowledged that CCTV should produce its L.O. programming in Chicago and knew or should have known that the Commission wanted the L.O. programming produced in Chicago. (*See also* Exh. 14, Letter of November 17, 1986).

CCTV also argues that the notice of violation charged CCTV only with a failure to document compliance and not with a failure to comply. However, CCTV does not claim it could prove compliance other than via documentation. If CCTV had live witnesses to prove its compliance, then it may have been prejudiced by the Commission's request for documentation only. But here, CCTV's failure to document compliance is tantamount to a failure to comply. Therefore, we see no error in the Commission's issuance of a notice of assessment based on a substantive violation despite the earlier notice of violation based on a failure to document.

 CCTV next argues that prior to January 13, 1987, CCTV was not given notice that the Commission would consider

issuing a notice of violation against CCTV at the January meeting, and that at that meeting, the Commission refused to allow CCTV to speak or make a presentation. Both these arguments must fail. CCTV has provided no support for its argument that it was entitled to notice and an opportunity to speak before it received a notice of violation. Normally, a governmental body must give notice before depriving someone of their property, not before issuing them a notice of violation.[17] CCTV had no constitutional right to be informed of the impending issuance of a notice of violation; so long as they had adequate notice prior to actual deprivation, the Constitution's requirements are satisfied. The same holds true for the right to speak; as long as the Commission gave CCTV an opportunity to make a presentation or speak on its own behalf prior to actual deprivation, there has been no due process violation.

■ CCTV's final process argument is that the Commission was not a fair and impartial tribunal. Due process prohibits a biased or partisan tribunal from hearing one's case. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980). However, CCTV does not provide any evidence of bias or partisanship by the Commission. The Committee's chair, Ms. Charleston, clearly was adamant in her belief that CCTV was in violation. Even if she was biased (on which we express no view), she did not vote on any of the resolutions important to this case. The remaining Commissioners all seemed to be conscientious and fair. They read CCTV's response, listened to CCTV's comments, allowed CCTV to file a petition for reconsideration, and listened to CCTV's presentation on that petition. We cannot find the Commission to have been biased or partisan. Accordingly, we find no violation of due process.

### 6. *Equal Protection*

■ CCTV's final argument is that it was deprived of its rights afforded by the Equal Protection Clause of the Fourteenth Amendment. CCTV argues that it and Group W were jointly and severally responsible for producing L.O. programming, and that Group W telecasted four and one-half hours of programming acquired from Cablenet just like CCTV did. Yet, only CCTV got slapped with a fine. Relying on *Ciechon v. City of Chicago*, 686 F.2d 511 (7th Cir.1982), CCTV concludes its rights to equal protection had been violated.

In *Ciechon*, the Seventh Circuit held that a municipality violates the Equal Protection Clause when it distinguishes between two similarly situated individuals for the imposition of discipline, and when it does so on arbitrary or irrational grounds.

The facts in this case do not support an Equal Protection violation. Although CCTV and Group W were jointly and severally responsible for providing nine hours of L.O. programming, an agreement between the two companies explicitly apportioned responsibility between themselves. In *Ciechon*, by contrast, the two paramedics had not divided up their responsibilities and each was equally responsible for the patient's welfare. While the Commission could have sanctioned Group W and at one time stood ready to do so, it chose to sanction only CCTV. The Commission's decision to sanction only CCTV was neither arbitrary nor irrational because CCTV was responsible for producing those hours of L.O. programming which actually violated the Franchise Agreement. CCTV's Equal Protection rights were not violated.

### CONCLUSION

Plaintiffs' motion for judgment is denied. Defendants' cross-motion for summary judgment is granted. Judgment shall be entered for the Chicago Cable Commission and the City of Chicago.

---

**17.** Indeed in some circumstances, a governmental body may seize property even before giving notice, if the post-deprivation procedures are adequate. *See, e.g., Tavarez v. O'Malley,* 826 F.2d 671, 674 (7th Cir.1987).