879 F.2d 1540
 CHICAGO CABLE COMMUNICATIONS, South Chicago Cable, Inc., and
Communications and Cable of Chicago, Inc.,
Plaintiffs-Appellants,
v.
CHICAGO CABLE COMMISSION and City of Chicago, a municipal
corporation, Defendants-Appellees.
 No. 88-1195.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 8, 1988.
Decided July 19, 1989.*
As Amended on Denial of Rehearing Aug. 15, 1989.
 
 James E. Betke, McDermott, Will & Emery, Chicago, Ill., for plaintiffs-appellants.
 Joel D. Stein, Craig J. Hanson, Judson H. Miner, Ruth Moscovitch, Law Dept., Chicago, Ill., for defendants-appellees.
 Before CUMMINGS, COFFEY and KANNE, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 The Chicago Cable Commission (the "Commission"), pursuant to Chapter 113.1 of the Municipal Code of Chicago, regulates the franchising of all cable television services for the City of Chicago. Plaintiffs in this case are three affiliated cable television service corporations, Chicago Cable Communications, South Chicago Cable, Inc., and Communications and Cable of Chicago, Inc. (collectively herein "CCTV" for "Chicago Cable TV"). They were fined $60,750 collectively by the Commission for allegedly violating the "local origination" ("LO") provisions of their identical franchise agreements with the City. They sought restitution of this fine through review in the district court, which ultimately affirmed the administrative agency's actions. 678 F.Supp. 734, 736 (N.D.Ill.1988). On appeal, CCTV contends that the City and particularly the Commission violated its rights to (1) due process by giving it inadequate notice or opportunity to be heard on the charges that it violated the franchise agreement, (2) equal protection by treating CCTV differently from another cable company which was not fined, and (3) free expression under the First Amendment due to impermissible content regulation.[1] We affirm.
 
 
 2
 The parties largely agree with the statement of facts provided by the district court[2] regarding LO programming[3] and the Commission's regulatory efforts. 678 F.Supp. at 736-739. This Court therefore will not restate this summary in detail, but instead will focus on the Commission's imposition of sanctions to determine whether a due process, equal protection, or First Amendment violation occurred. In so doing we are guided by the district court's factual findings unless they are erroneous. Cf. Fed.R.Civ.P. 52(a); Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); Evanston Bank v. Brink's, Inc., 853 F.2d 512, 516 (7th Cir.1988).
 
 
 3
 * Chapter 113.1 of the Municipal Code created five separate areas for cable services for the City of Chicago. CCTV was granted the franchises for Areas 1, 4 and 5, while a different company, Group W Cable (not a party to this litigation), was awarded the franchises for Areas 2 and 3. The franchise agreements between the City and grantees CCTV and Group W required the grantees both to produce and program a certain amount of LO programming per week, with each grantee to produce in Chicago one-half of the total required programming according to an agreed schedule. The grantees were to pledge up to $6,000,000 to produce this programming for 15 years and jointly to equip an LO production facility with staff consisting of local residents used for both full and part-time internship purposes. During the period involved here, CCTV and Group W Cable were obliged to transmit a total of nine hours local programming per week, and they divided this obligation evenly.
 
 
 4
 The Commission was created within the Mayor's office to supervise this regulation and to enforce the terms of the franchise agreements against the cable companies. After its initial July 1986 meeting, Commission Chairperson Robin Charleston requested Group W and CCTV to submit monthly reports on their LO scheduling, and in August, Group W responded for both, reporting that CCTV was "presently considering contracting its program production efforts to a third party [Cablenet, a suburban affiliate of CCTV] who would supply all necessary production manpower." This progress report was reiterated in Group W's monthly statement for September 1986.
 
 
 5
 In October, both grantees began to transmit their four and one-half hours apiece of LO programming. The Commission congratulated them on meeting the initial requirements for scheduling. The November meeting proceeded without problems; yet at the December meeting, the Commission, upon noticing that CCTV's monthly report on LO scheduling was less descriptive than Group W's report, asked CCTV for a sample of its LO programming.
 
 
 6
 Controversy between all concerned arose at the January 13, 1987, meeting when Chairperson Charleston requested the Commission's authorization to issue a "Notice of Violation" of the franchise agreement against CCTV allegedly because:
 
 
 7
 1. CCTV has not demonstrated how their current programming is actually local origination in that it is actually locally produced (within the City of Chicago) and is [instead] solely under the control of TCI [Telecommunications, Inc., Mt. Prospect, Illinois, affiliate of CCTV].
 
 
 8
 2. CCTV has not provided documentation on the provision of one full-time non-alphanumeric [video] channel and two alphanumeric channels in each Area.
 
 
 9
 3. No documentation of efforts to establish internship programs for local residents and ongoing relationships with local schools.
 
 
 10
 4. CCTV has not documented its [one-half] share of the nine hours required weekly in Year 1 for L.O. programming.
 
 
 11
 5. No documentation or proof of joint participation with other [Chicago] area grantees in centralized L.O. studio and mobile equipment has been provided by CCTV.
 
 
 12
 678 F.Supp. at 740. This action was done pursuant to Section 29 of the franchise agreement, which sets forth the procedure by which the Commission may enforce the terms of the agreement. The first step in any enforcement proceeding is the issuance of a notice of violation in writing setting forth the specific nature of the violation. The grantee then has 30 days (or less if the Commission determines the violation is so serious that a shorter time period is warranted) either to remedy the violation or to respond in writing contesting the notice of violation with supporting documentation indicating either that the violation did not occur or it was beyond the grantee's control, and requesting an opportunity to be heard. If after contesting the violation, the grantee fails to prove a violation did not occur, the Commission then may penalize the grantee. The Commission may fine the grantee up to $750 per day per violation, and must notify the grantee of the violation and fine by issuing a "Notice of Assessment." 678 F.Supp. at 739 n. 10.
 
 
 13
 CCTV responded to the January 15, 1987, notice of violation, stating that of the total nine hours of LO programming per week required of it and Group W, 4.5 hours came from Group W in Chicago and 4.5 hours came from CCTV's affiliated companies in the surrounding suburban area. CCTV also stated that it selected shows from a pool of all available suburban shows it believed would be interesting to its Chicago customers. However, it did not demonstrate that the 4.5 hours were geared to Chicago as required by the franchise agreements.
 
 
 14
 At its February 10, 1987, meeting, Chairperson Charleston recommended that CCTV be fined for violating the franchise agreements. The Commission heard testimony from Diane Minor, a staff member, as well as from Michael Green, CCTV's general manager. After this hearing, the Commission found a violation and fined CCTV $750 for each day for each of the three areas it was to serve. The notice of assessment sent to CCTV stated in pertinent part:
 
 
 15
 THE CHICAGO CABLE COMMISSION FINDS AS FOLLOWS:
 
 
 16
 1. Based on the submission by CCTV/TCI, the programming shown over CCTV/TCI's local origination channels and claimed by CCTV/TCI to satisfy its local origination obligations as Grantees for Areas 1, 4, and 5 "is acquired through [CCTV/TCI's] affiliated TCI companies in the surrounding Chicagoland area" instead of being produced by CCTV/TCI itself. Furthermore, based on the submission by CCTV/TCI, the subjects of the programming are, for the most part, geared to the broad City-suburban Chicagoland areas rather than the communities that CCTV/TCI serves.
 
 
 17
 678 F.Supp. at 741. CCTV quickly filed a petition for rescission of this violation and assessment while raising numerous legal challenges. In response, Charleston requested evidence that CCTV produced the requisite LO shows and did so within Chicago, while CCTV claimed that Group W was to be in charge of all production concerns. At the March meeting, the Commission voted to deny CCTV's petition and assessed fines of $750 per day, for 27 days for the three areas, totaling $60,750. The Commission also decided that in the meantime CCTV had subsequently remedied its past violation through an arrangement with Group W.
 
 II
 Due Process
 
 18
 CCTV argues on appeal that its due process rights were compromised because the Cable Commission adopted a new definition for the term "local origination" at the February 10 meeting and then found CCTV in violation. CCTV submits that local origination had previously only referred to physical production in Chicago, which was the stated reason for the notice of violation, but that the February 10 notice of assessment cited CCTV both for failing to provide locally produced programming as well as community-specific programming. CCTV asserts that its due process rights were compromised when the Commission changed the standards governing local origination without notice and therefore fined CCTV. It also contends that the January 15 notice of violation charged it only with a failure to document compliance and not with a specific failure to comply. CCTV further asserts that before the Commission's January 13, 1987, meeting, CCTV was not advised that the Commission might authorize issuance of a violation notice against it at that time and that at said meeting, the Commission refused to allow CCTV to respond to the charges.
 
 
 19
 The legal principles involved in this case are clear regarding notice and opportunity. Prior to deprivation of life, liberty or property, due process requires that a governmental entity must provide a citizen adequate notice, Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), as well as ample opportunity to be heard at a meaningful time and in a meaningful manner appropriate to the nature of the case. Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976); Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). In Mathews, the Supreme Court recited three factors required in a due process analysis in the context of a challenge to hearing procedures:
 
 
 20
 First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 21
 424 U.S. at 335, 96 S.Ct. at 903; see also Birdsell v. Board of Fire and Police Comm'rs, 854 F.2d 204, 207 (7th Cir.1988) (listing factors).
 
 
 22
 Adequate notice both apprises the individual of the hearing and permits adequate preparation to present objections. Memphis Light, Gas and Water Div. v. Craft, 436 U.S. 1, 13, 98 S.Ct. 1554, 1562, 56 L.Ed.2d 30 (1978); Wolff v. McDonnell, 418 U.S. 539, 577-578, 94 S.Ct. 2963, 2985-2986, 41 L.Ed.2d 935 (1974). In Memphis Light, the Court held that its "flexible" approach to due process, taking account of private interests, the potential for reducing erroneous deprivations and the costs of procedures needed to reduce errors, applies to evaluations of notice as well as the procedures at the hearing. Id. 436 U.S. at 14 n. 15, 98 S.Ct. at 1563 n. 15; see also Tulsa Professional Collection Servs., Inc. v. Pope, 485 U.S. 478, 108 S.Ct. 1340, 1344-1347, 99 L.Ed.2d 565 (1988) (sufficiency of notice depends on balance of state and individual interests); Mullane, 339 U.S. at 313-314, 70 S.Ct. at 656-657 (balancing state's interest in reducing costs of notice to beneficiaries of small, jointly managed trusts against beneficiaries' "right to be heard," before opportunity to challenge trustees' action was foreclosed); Birdsell, supra, 854 F.2d at 207-208 (inaccurate nature of termination hearings outweighs any slight benefits accruing to City); Wilson v. Health & Hosp. Corp., 620 F.2d 1201, 1214 (7th Cir.1980) ("elements to be included in the notice are to be tailored to the circumstances of the case and depend upon an appropriate accommodation of the competing private and governmental interests").
 
 
 23
 "It is universally agreed that adequate notice lies at the heart of due process. Unless a person is adequately informed of the reasons for denial of a legal interest, a hearing serves no purpose--and resembles more a scene from Kafka than a constitutional process." Cosby v. Ward, 843 F.2d 967, 982 (7th Cir.1988) (quoting Gray Panthers v. Schweiker, 652 F.2d 146, 168 (D.C.Cir.1980)). Parties must be notified of the precise issues to be raised in the hearing, In re Ruffalo, 390 U.S. 544, 550-551, 88 S.Ct. 1222, 1225-1226, 20 L.Ed.2d 117 (1968); Camacho v. Bowling, 562 F.Supp. 1012, 1020-1022 (N.D.Ill.1983), and such notice must be provided "at a meaningful time." Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).
 
 
 24
 In an administrative context such as this, an agency complaint that reasonably informs a person of the controversial issues involved satisfies due process unless that person can demonstrate that he or she was misled. L.G. Balfour Co. v. FTC, 442 F.2d 1, 19 (7th Cir.1971) (quoting Cella v. United States, 208 F.2d 783, 789 (7th Cir.1953), certiorari denied, 347 U.S. 1016, 74 S.Ct. 864, 98 L.Ed. 1138 (1954)). Moreover, just because an agency violates its own rules under state law does not turn an administrative case into a denial of due process of law, see, e.g., Herbert v. Louisiana, 272 U.S. 312, 316, 47 S.Ct. 103, 104, 71 L.Ed. 270 (1926); Coniston Corp. v. Village of Hoffman Estates, 844 F.2d 461 (7th Cir.1988), and we may look to state law[4] to determine whether there is a "legitimate claim of entitlement." Vukadinovich v. Bartels, 853 F.2d 1387, 1389 n. 3 (7th Cir.1988).
 
 
 25
 A review of the facts of this case convinces us that CCTV was provided with an ample opportunity to be heard at a meaningful time and in a meaningful manner. Mathews, 424 U.S. at 333, 96 S.Ct. at 902. First and foremost, the notice of violation given to CCTV was sufficient to apprise it of the charged violation. It repeated all five alleged violations. In pertinent part the notice alleged that plaintiffs had failed "to document how their current programming is actually local origination" and "locally produced" and that CCTV had failed "to document their participation in the production of nine hours [split evenly between CCTV and Group W] required weekly in year I for L.O. programming." It also directed that each of the three CCTV franchisees, within fifteen days of receipt of the notice, either respond in writing to the Commission contesting the notice of violation with supporting documentation to show otherwise and requesting an opportunity to be heard, or remedy the particular violation. (Exhibit 2 to Commissioner's Administrative Record.)
 
 
 26
 Contrary to its contention, CCTV was fined not for violating a new definition of local origination, but rather for failing to produce programming in Chicago, as stipulated in the notice of violation. Whatever else was subsequently added to the meaning of local origination was surplusage as far as this issue is concerned. The franchise agreement clearly envisioned local production, the notice of violation was based on the same requirement, and the ultimate notice of assessment premised the violation on local production, although "[f]urthermore" criticizing CCTV's suburban-type subject matter. That the lack of Chicago production was the true basis for the fine is manifested as well by the parties' subsequent conduct at the hearing on CCTV's motion to reconsider. After the assessment occurred, CCTV presented a plan to the Commission in which CCTV and Group W would jointly produce their local origination programming at a local Chicago facility, rather than in Mount Prospect, the site of the programming for which CCTV had been fined. Based on this proposal the Commission decided to withhold imposition of further fines until the new programming was produced. No mention was even made as to the suburban content of the programming. This further highlights the fact that CCTV was fined for non-compliance with the local production requirement rather than for suburban-oriented content, as shown in the notice of violation. CCTV accordingly had notice of the charge against it.
 
 
 27
 CCTV's second claim of denial of due process centers on its argument below that the violation notice solely charged it with a failure to document compliance, not with a substantive failure to comply. Yet, as correctly held by the district court, "CCTV does not claim that it could prove compliance other than via documentation." 678 F.Supp. at 747. On appeal, it still does not state any evidence to document compliance, and therefore its omission is tantamount to a failure to comply, as the district judge noted. 678 F.Supp. at 747.
 
 
 28
 CCTV's final due process contention is that it was not permitted to speak or to make a presentation before it received a notice of a violation. However, there is no constitutional right to be told of an impending notice of violation as long as there is sufficient notice prior to the actual deprivation of property, as there was here. See Tavarez v. O'Malley, 826 F.2d 671, 674 (7th Cir.1987).
 
 Equal Protection
 
 29
 CCTV claims that the Commission violated its right to equal protection of the laws under the Fourteenth Amendment by fining it but not Group W, which had cablecast the same amount of programming acquired from suburban Cablenet. The franchise agreement between the grantees and the City stipulated that both CCTV and Group W were jointly and severally liable for cablecasting nine hours of LO programming. While Group W's share was produced in Chicago and had a Chicago focus, CCTV's portion of LO shows was produced in Mount Prospect, Illinois, and was not geared to Chicago.
 
 
 30
 As below, CCTV relies on Ciechon v. Chicago, 686 F.2d 511 (7th Cir.1982), for the sweeping proposition that selective enforcement of identical franchise agreements denies equal protection. In Ciechon, this Court found that the City of Chicago violated equal protection by firing only one of two paramedics, both of whom had been called to rescue a victim. In Ciechon, both paramedics were equally responsible, and therefore differential treatment was not justified. In this case, however, the Commissioner's decision to fine CCTV alone was justified since only CCTV was responsible for not presenting weekly four and one-half hours programmed for and produced in Chicago and therefore violating the agreement. CCTV's attempt to align its case semantically with Ciechon on the basis of "equal responsibility" therefore fails.
 
 First Amendment
 
 31
 CCTV claims that the Commission's imposition of a fine based partly on the subject matter of its required four and one-half weekly hours of LO programming[5] constituted impermissible content regulation, thereby violating its First Amendment right to free expression. This is a novel question, for the Supreme Court has yet to determine the applicable standard for review of a challenge to a municipal regulation of cable television. See City of Los Angeles v. Preferred Communications, 476 U.S. 488, 496, 106 S.Ct. 2034, 2038, 90 L.Ed.2d 480 (Blackmun, J., concurring).
 
 
 32
 The court below concluded that the appropriate framework for analysis in this case was provided by United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968):
 
 
 33
 a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged first amendment freedoms is no greater than is essential to the furtherance of that interest.
 
 
 34
 678 F.Supp. at 745.[6] The defendants have the burden of proving that the second and fourth elements of this test are satisfied.[7] Century Federal Inc. v. City of Palo Alto, 648 F.Supp. 1465, 1475 (N.D.Cal.1987), appeal dismissed, --- U.S. ----, 108 S.Ct. 1002, 98 L.Ed.2d 969 (1988).
 
 
 35
 CCTV's scheduling plainly implicates First Amendment interests, for cable operators exercise "a significant amount of editorial discretion regarding what their programming will include." Preferred Communications, 476 U.S. at 494, 106 S.Ct. at 2037 (quoting FCC v. Midwest Video Corp., 440 U.S. 689, 707, 99 S.Ct. 1435, 1445, 59 L.Ed.2d 692 (1979)). The Supreme Court has interpreted the First Amendment to allow more government regulation of television than of theaters, movies, books, newspapers, or open air addresses. Compare Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), with Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). We adhere to our position that "there are enough differences between cable television and the non-television media to allow more government regulation of the former." Omega Satellite Prod. v. City of Indianapolis, 694 F.2d 119, 128 (7th Cir.1982); see also Community Communications Corp. v. City of Boulder, 660 F.2d 1370, 1377-1380 (10th Cir.1981), certiorari dismissed, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982), where the court noted that as to cable television "government must have some authority * * * to see to it that optimum use is made of the cable medium in the public interest." Id. at 1379. As other courts have held, O'Brien is an appropriate standard-bearer for dealing with questions of local regulation of cable television. See, e.g., Erie Telecommunications v. City of Erie, 659 F.Supp. 580 (W.D.Pa.1987), affirmed, 853 F.2d 1084 (3d Cir.1988); Carlson v. Village of Union City, 601 F.Supp. 801 (W.D.Mich.1985); Berkshire Cablevision of Rhode Island v. Burke, 571 F.Supp. 976 (D.R.I.1983), vacated as moot, 773 F.2d 382 (1st Cir.1985). This is especially so here, where CCTV was only required to present four and one-half hours weekly of local origin programming.
 
 
 36
 Our adoption of an O'Brien test in the cable context does not justify abandoning First Amendment scrutiny due to the fact that cable operators require use of a public right of way or that the "natural monopoly characteristics" of cable create economic constraints on competitors comparable to the physical constraints imposed by the limited size of the electromagnetic spectrum. Omega Satellite, 694 F.2d at 127; see also G. Shapiro, P. Kurland, & J. Mercurio, Cablespeech: The Case for First Amendment Protection 9-11 (1983); R. Posner, Cable Television: The Problem of Local Monopoly 4 (1970). Rather, each medium of expression must be assessed by standards properly suited to it. Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 501, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981).
 
 
 37
 A proper analysis under O'Brien begins with an appraisal of whether the interest to be served by a governmental measure is truly substantial. Century Communications Corp. v. FCC, 835 F.2d 292, 295 (D.C.Cir.1987). If it is, the next relevant step is to determine the fact-based issue of whether the means chosen are congruent with the desired end, or whether they are too broadly tailored to pass constitutional muster. See O'Brien, 391 U.S. at 377, 88 S.Ct. at 1679; Quincy Cable TV, Inc. v. FCC, 768 F.2d 1434, 1454-1462 (D.C.Cir.1985) (using key two-step O'Brien analysis invoked here).[8] Since the municipal code and franchise agreement's LO requirements implicate the second and fourth parts of the O'Brien test (note 7 supra ), we now proceed to show that they have been met by defendants.
 
 1. Substantiality of Governmental Interest
 
 38
 The Commission and City contend that these minimal LO rules serve the interest of preserving free, locally oriented television and provide an outlet for community expression and choice of programming. The four and one-half hour local programming requirement is said to improve communications between the citizens and the City as well as encouraging participation of minorities in the economic opportunities created by cable television. On the other hand, CCTV claims that there is no governmental interest furthered by regulating the content of LO programming.
 
 
 39
 Yet substantial governmental interests are at stake and fostered by LO programming requirements. In United States v. Midwest Video Corp., 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972), the Court held that the Federal Communications Commission could require cable operators to have facilities available for local production. Id. at 653-654, 92 S.Ct. at 1863-1864. This origination rule would reasonably further the goals of "increasing the number of outlets for community self-expression and augmenting the public's choice of programs * * *." Id. at 668, 92 S.Ct. at 1870. Similarly, the LO requirements in this case assure community participation in the production and programming of cable television. Cf. Berkshire Cablevision, 571 F.Supp. at 987.
 
 
 40
 Promotion of community self-expression can increase direct communication between residents by featuring topics of local concern. Encouragement of "localism" certainly qualifies as an important or substantial interest. See Quincy Cable, 768 F.2d at 1454. The district court focused on this by noting that[t]he important qualities embodied in the term "localism" (community pride, cultural diversity, etc.) may not be furthered enough simply by the availability of local broadcast television stations for retransmission over cable systems, but may require original cable programming specifically concerning the locality and directed at that locality's residents. The Commission's L.O. requirement helps foster those interests by insisting that those cable companies operating within the City of Chicago produce their L.O. programming within the City of Chicago and designed specifically for City residents.
 
 
 41
 678 F.Supp. at 745.
 
 
 42
 An additional interest fostered by the defendants' LO requirement is the provision of jobs for residents of Chicago. Production of programming in the City provides career opportunities as well as potential internships for students studying communications at local schools. All of the above objectives of the LO rules are important and substantial concerns of the City, thereby satisfying the relevant second prong of O'Brien.
 
 2. The Congruence Between Means and Ends
 
 43
 The pertinent fourth tier of the O'Brien test focuses on the congruence between the means chosen by the Commission to regulate cable television and the end it seeks to achieve. While the Commission has adequately demonstrated the substantiality of the interest served by the LO rules, their validity also depends on whether these restrictions were "no greater than is essential to the furtherance of that interest." Quincy Cable, 768 F.2d at 1459 (quoting O'Brien, 391 U.S. at 377, 88 S.Ct. at 1679). Because the municipal code's and franchise agreement's LO requirements may be characterized as content-related, they "may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." Consolidated Edison Co. v. Public Service Commission, 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978); Buckley v. Valeo, 424 U.S. 1, 65, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976). Or, put another way, is each of the restrictions no greater than is essential to the furtherance of that interest?
 
 
 44
 United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985), lends guidance by holding that burdens of this kind are not invalid just because there might be some less burdensome alternatives. "So long as the neutral regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation," an incidental burden on speech is permissible under O'Brien. Id. See also Board of Trustees of State University of New York v. Fox, --- U.S. ----, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (under O'Brien means must be narrowly tailored but not necessarily the least restrictive alternative, citing Clark v. Community for Creative Nonviolence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984)).
 
 
 45
 Cable programming, like other forms of the electronic media, is an economically scarce medium. Unlike the traditional forms of print media, a cable programmer enjoys a virtual monopoly over its area, without the threat of an alternative provider. As a result the government, which serves as the representative of cable customers, is duty-bound to recognize the effects of "medium scarcity" by ensuring that the few programmers who are granted a franchise make optimum use of it. See Boulder, 660 F.2d at 1379; Berkshire Cablevision, 571 F.Supp. at 986-987. With this in mind, it is within the City's rights, arguably its responsibilities, to proffer some requirements guaranteeing that the cable customers are, to the extent possible, accorded a range of programming from the franchisee, since the cable viewing public has no other channel to which to turn.
 
 
 46
 Finally, it is worth noting that CCTV is required to broadcast just four and a half hours of local origination programming per week. The City is not seeking a dominant interest in CCTV's cable programming, nor even a substantial interest, but simply a few hours a week. And of these four and a half hours of programming, CCTV is not required by the municipal code or franchise agreement to cablecast any specific program, kind of show, or editorial viewpoint. As long as the particular episode is geared to Chicago--be it sports, politics, news, weather, entertainment, etc.--CCTV has full discretion over what it may desire to transmit. This restriction on CCTV's control in meeting the minimal LO requirements does not divest it of discretion, for, as in Midwest Video, the cable operator here still retains the ultimate decision over which LO programs to air during the brief weekly period at issue. See Berkshire Cablevision, 571 F.Supp. at 984 (citing Midwest Video ). The limited restriction at issue is really no greater than essential to further substantial City interests. It cannot be gainsaid that substantial interests of the community are well served by requiring some local programming. Considering the benefits to the community, this four and one-half hour weekly obligation is sufficiently modest to avoid First Amendment prohibition.
 
 Conclusion
 
 47
 CCTV has not persuaded this Court that its due process, equal protection, or First Amendment rights were violated by the Commission's imposition of a $60,750 fine for breach of the franchise agreement. Accordingly, the district court's grant of summary judgment for the Commission and City of Chicago was proper.
 
 
 48
 Affirmed.
 
 
 
 *
 The delay in issuing this opinion was caused by lengthy panel deliberations about the outcome
 
 
 [1]
 CCTV also asserts that there was no evidence in the record sufficient to support the Commission's findings. It claims that nothing demonstrates that the Commission ever viewed any LO programming. This, however, is a meritless argument, for CCTV itself failed to provide copies of its schedules; it only sent written descriptions. CCTV additionally admitted that its programs were produced in Mount Prospect, Illinois, not in Chicago. Accordingly, we hold here that there existed substantial evidence to support the Commission's findings. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); NLRB v. Burkart Foam, Inc., 848 F.2d 825, 829 (7th Cir.1988)
 Secondly, while CCTV claimed below that the Commission unreasonably interpreted the LO provision in the franchise agreement to require programming with a local focus, it now concedes on appeal that "the reasonableness of the definition is not the issue" (Br. 26 n. 17).
 CCTV has a third argument that additionally merits summary disposition. It argues that it complied with the franchise agreement's provision authorizing grantees to use contractors to produce programming (Br. 45-46). Yet the violation was really based on the non-local production. Even if Group W Cable, another Chicago area franchisee, may be considered such a "contractor" under the agreement (Attachment G1 at App. 35), this fails to justify CCTV's not providing programming produced in Chicago by anyone to meet its minimum LO requirements.
 
 
 [2]
 The Commission contests the district court's statement that the City awarded CCTV "the exclusive right" to provide cable service for each of CCTV's franchise areas (Br. 3 n. 1). It correctly points out that the franchise agreement designates that the franchisee for each area is granted a "non-exclusive franchise."
 
 
 [3]
 "LO programming" is defined by the National Cable Television Association as "programming ... which is developed by an individual cable television system specifically for the community it serves." 678 F.Supp. at 740. Here the franchised areas were all in Chicago
 
 
 [4]
 Illinois law provides:
 Every action to review any final administrative decision shall be heard and determined by the court.... The hearing and determination shall extend to all questions of law and of fact presented by the entire record before the court. No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court. The findings and conclusion of the administrative agency on questions of fact shall be held to be prima facie true and correct.
 Ill.Rev.Stat. ch. 110, para. 3-110 (1987).
 
 
 [5]
 As noted earlier, by agreement between the grantees, Group W was to produce the other four and one-half weekly hours of LO programming
 
 
 [6]
 Conceivably it could also be argued that CCTV contractually waived its First Amendment claim. In Erie Telecommunications v. City of Erie, 853 F.2d 1084 (3d Cir.1988), the Third Circuit, after determining that constitutional rights, like rights and privileges of lesser importance, may be contractually waived, construed a consent decree settling a lawsuit between two rival cable programmers and the City of Erie as barring a later action by one of the cable programmers against the City. Since the consent decree settled a suit which included a First Amendment claim, the Third Circuit believed a later comparable First Amendment claim to be waived. Of course in this case the only contract was the initial franchising agreement, a significant distinction from Erie, and serious reservations arise when a local government with a virtual monopoly on cable access conditions a franchise contract with a cable programmer on the stipulation that the programmer waive certain constitutional rights, see, e.g., Western & Southern Life Ins. Co. v. State Board of Equalization, 451 U.S. 648, 657-658, 101 S.Ct. 2070, 2077-2078, 68 L.Ed.2d 514 (1981); Sherbert v. Verner, 374 U.S. 398, 404-405, 83 S.Ct. 1790, 1794-1795, 10 L.Ed.2d 965 (1963); Frost & Frost Trucking Co. v. Railroad Comm'n, 271 U.S. 583, 592-593, 46 S.Ct. 605, 606-607, 70 L.Ed. 1101 (1926). In any event we need not decide this issue since neither party advanced this argument here or in the district court
 
 
 [7]
 As the district judge observed, the first and third requirements are satisfied (678 F.Supp. at 745 n. 14) and therefore will not be discussed in this opinion
 
 
 [8]
 In contrast to the limited local programming requirement here, Quincy Cable invalidated all-encompassing "must carry" rules of the Federal Communications Commission requiring cable TV operators to transmit every over-the-air television broadcast signal that is significantly viewed in the community or considered local under its rules (768 F.2d at 1437), but the court of appeals assumed that less burdensome regulations furthering an important or substantial governmental interest would be permissible under the First Amendment. 768 F.2d at 1450, 1454