**United States Court of Appeals**
**Fifth Circuit**

# F I L E D

**June 18, 1999**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 98-20031

ROBERT HORTON, NATIONALIST TELEVISION, a Texas Non-Profit
Corporation; and BARRY HACKNEY,

Plaintiffs-Appellants,

versus

CITY OF HOUSTON, TEXAS and ACCESS HOUSTON CABLE CORPORATION,

Defendants-Appellees.

**Appeal from the United States District Court
for the Southern District of Texas**

June 18, 1999

Before KING, Chief Judge, JOLLY, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

At issue in this appeal is whether Access Houston Cable Corporation ("Access"), a "PEG" cable channel,[1] **can, consistent with the First Amendment, charge a fee to cable-cast programs not "locally produced" in and around Houston, Texas. We conclude that Access Houston's fee requirement is a content-neutral regulation which implements a significant governmental interest in promoting localism, but Access has not met its burden of proving that the fee is narrowly tailored to serve that interest. We therefore reverse the grant of summary judgment and remand for further proceedings.**

### BACKGROUND

The City of Houston granted a cable franchise to Warner Cable Communications ("Warner") that required Warner to designate

---

[1]PEG channels are those reserved for public, educational or governmental use by the municipal franchise agreement with a cable operator. See 47 U.S.C. § 531 and 531(e).

at least four PEG channels for the city's benefit.[2] **Houston then engaged Access to manage the channels, including a public access channel.[3] Access is not a typical cable channel: It does not operate for profit, it does not have an editorial board that selects programming for cable-cast, and it does not sell advertising space. Instead, Access's programming space is open to any individual or organization who wishes to televise constitutionally protected speech. Access neither produces programs nor broadcasts commercial programs. To promote the original programming on which it relies, Access offers (for a nominal fee) video cameras and other production equipment, training workshops, studio space and other services.**

**Access touts that it will broadcast any non-commercial program as long as the program engages in constitutionally protected speech and complies with various rules designed to allocate air time among the programmers. Access employees do not pre-screen submitted programs to determine whether they comply with the non-commercial speech rule or the First Amendment; instead, Access requires program providers to accept liability for the content of their programs by signing a Program Contract before the program will be aired.[4]**

---

[2]Under the franchise agreement, the City of Houston can require Warner to make available an additional four cable channels if certain conditions are met.

[3]That Access is a state actor is undisputed on appeal.

[4]Pursuant to Rule 2.A-5, all program providers who wish to schedule broadcast time with Access must first sign a Program Contract. The Rule states that,

At the time this dispute arose, Access sought to encourage programs "that reflect[] the activities, culture, concerns, and interests of the citizens of Houston and []promote a free exchange of ideas, information and understanding."[5]  To fulfill its contractual obligation with the City, Access's Board of Directors adopted a rule, which has been in effect since 1988, providing for "locally produced" programs to be broadcast free of charge.  To qualify as a "locally produced program," at least 50 percent of the program must have been shot within the Houston Standard Metropolitan Statistical Area.  Programs that do not comply with the "locally produced" rule are assessed a fee: individuals who submit non-local programs must pay $75 for each hour of programming, while organizations are charged $100 per hour. Because Access does not pre-screen submitted programs, it cannot initially determine whether a program complies with the rule. Access relies on each program provider voluntarily to disclose whether the submitted program was locally produced.

In March 1992, Appellant Nationalist Television ("N-TV"), as agent for Houston resident appellant Robert Horton, submitted a

---

2.A-5  PROGRAM CONTRACT AND RESPONSIBILITY:  Before access programs are scheduled for cable-cast, the access program provider must sign a Program Contract which holds the program provider liable for content of the program and pay all applicable fees.  In signing the Program Contract, the program provider agrees in writing that his or her program does not include any form of "constitutionally unprotected speech."

[5]Access Houston ByLaws Art. III (1986).  After the events in this case, in its 1994 contract with the City of Houston, the requirement to support localism became more explicit:  "a minimum of 51 percent of the total hours programmed on the Access channel shall be locally produced in the Houston metropolitan area."

30-minute program for cable-cast entitled *Airlink*.[6]  After a month had passed and the program had not been cable-cast, N-TV wrote to the Houston City Attorney's office demanding that Access immediately cable-cast *Airlink*.  The City Attorney replied that Access operates independently of the City and that Houston cannot require Access to broadcast *Airlink*.  In addition, N-TV was informed that, according to Access, N-TV had not complied with the procedural requirements necessary to broadcast *Airlink* and that N-TV should directly contact Access to complete the application process.  Despite this notification and the receipt of a complete copy of the Access procedural rules, N-TV continued to complain to the Houston City Attorney's Office rather than to Access.  Months later, N-TV turned to Access and learned that it, like all other program providers, must sign a Program Contract.  Two months more passed, N-TV finally signed the requested Program Contract, and Access began cable-casting *Airlink*.

*Airlink* was produced at a studio in Mississippi and did not qualify as a "locally produced program."  N-TV was thus required to pay the $100 cable-cast fee.[7]  N-TV refused to pay, arguing that the fee violated the First Amendment, and filed the present lawsuit seeking a declaratory judgment, a temporary restraining order, and a permanent injunction.  Ironically, Access began regularly cablecasting *Airlink* just after the suit was filed,

---

[6]The content of *Airlink* is described as "pro-majority" in some portions of the record and "white supremacist" in other parts of the record.

[7]Since *Airlink* was a half-hour program, the $100 fee was prorated, making N-TV liable for $50 per cable-cast.

from December 1992 through February 1993. When N-TV refused to pay fees for the three months of programming that had been aired, *Airlink* was canceled.

Immediately after appellants filed suit, the district court held a hearing to rule on appellants' request for a temporary restraining order ("TRO hearing"). The district court denied the request and offered to set the case for trial. Each party then moved for summary judgment. The court held in favor of Access and the city, ruling that the fee requirement is a facially valid, content-neutral regulation incidental to free speech under the test articulated in *United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673 (1968), and that the appellants failed to raise a genuine issue of material fact regarding whether the fee requirement was unconstitutional as applied.

### STANDARD OF REVIEW

The standard of review of a summary judgment at the appellate level is *de novo*. Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24, 106 S. Ct. 2548 (1986). Under this standard, all fact questions must be viewed in the light most favorable to the non-moving party, and questions of law are reviewed *de novo*. *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079 (5th Cir. 1995).

5

## DISCUSSION

N-TV scatter-guns its First Amendment arguments against the Access fee for non-locally-produced programs. Attacking the fees both facially and as applied, N-TV asserts that the fee rule grants overbroad, arbitrary discretion to Access administrators, encouraging content-based discrimination against programs. More fundamentally, N-TV contends that the fee regulation is an impermissible content-based rule. N-TV also levels equal protection, overbreadth and vagueness challenges to the fees, but these arguments were not raised in the district court and will not be considered here.

Fitting the PEG channels into the familiar holes of First Amendment jurisprudence is not easy. The premise of our discussion is that programmers have some kind of First Amendment rights to share the podium at a PEG local access channel set aside by Houston's cable franchise contract. The Supreme Court has implied that all of the participants in cable television-programmers, cable operators, TV broadcasters, PEG channels -- enjoy free speech rights, but the limits of those competing and potentially conflicting rights are far from clear. *See generally,* Pluralism on the Bench: Understanding *Denver Area Educational Telecommunications Consortium v. FCC*, 97 Colum. L. Rev. 1182 (1997).

The first conundrum relates to the dubious status of PEG channels, which municipalities have the authority to set aside in their cable franchise agreements with cable operators. *See* 47 U.S.C. § 531(a). In the "must-carry" case, the Supreme Court

6

upheld a federal law requiring cable operators to make available transmission space for local TV broadcasters. *Turner Broadcasting System v. FCC*, 512 U.S. 622, 114 S. Ct. 2445 (1994). The Court concluded that the "must-carry" provisions are a content-neutral regulation designed, not to force a particular type of speech upon cable operators, but to further the non-speech-related goals of protecting local broadcasters and assuring free TV access to citizens who lack cable connections. The four dissenters in *Turner* essentially stated, however, that forced set-aside of PEG channels is a content-related imposition on cable operators, *Turner* 512 U.S. at 675, 114 S. Ct. at 2476 (O'Conner, J., concurring in part and dissenting in part), and the majority decision offers no rationale opposed to such a conclusion.[8] **Justice Thomas reiterated the PEG constitutionality problem and scholarly discussions of it in the Court's most recent cable decision, only to note that the issue had not been raised.** ***See Denver Area Educ. Telecomm. Consortium v. FCC*, \_\_\_ U.S. \_\_\_, 116 S. Ct. 2374 (1996).** **The ultimate fate of PEGs, including Houston's local access channel, remains in doubt, but is not to be decided in this case.**

**The second conundrum arises from the implicit concession of Access that the local access channel represents a government-owned designated public forum. Nevertheless, the Supreme Court has cautioned that "the public forum doctrine should not be extended in**

---

[8]Indeed, the majority emphasized that neither the must-carry rule nor laws and rules presently applicable to broadcasting (*e.g.* on non-commercial stations) directs the content of the programs. *Turner*, 512 U.S. at 649-651, 114 S. Ct. at 2462-63.

a mechanical way to the very different context of public television-broadcasting." *Arkansas Educ. Television Comm. v. Forbes*, __ U.S. __, 118 S. Ct. 1633, at 1639 (1998). In a later cable regulation case, seven justices of the Court either rejected or declined to consider Justice Kennedy's assertion that a local access channel is a public forum available to citizens under the most exacting constitutional standards. *Compare Denver Area*, ___ U.S. at ___, 116 S. Ct. at 2404-05 (Kennedy, J., concurring in part and dissenting in part), *with id.* ___ U.S. at ___, 116 S. Ct. at 2388-89 (Breyer, J.) (refusing to consider public forum doctrine), *and id.* ___ U.S. at ___, 116 S. Ct. at 2426-28 (Thomas, J., concurring in the judgment in part and dissenting in part) (PEG channel is not a public forum). If one were either to press the analogy between Access and a classic public television station or to reject the public forum doctrine for local access channels, then Access would enjoy virtually unfettered programming discretion. Access does not request such latitude, however, so the arguments that Access is not a public forum or is a limited public forum are not before us.

The consequence, for First Amendment purposes, of ascribing particular forum (or non-forum) characteristics to Access lies in the strictness of legal scrutiny that will be applied to Access's fee regulation. Access contends that the regulation is subject to "intermediate scrutiny" because it has nothing to do with the content of programmers' speech. *Turner,* 512 U.S. at 642, 114 S. Ct. at 2459. N-TV argues and Access concedes that were the

regulation content-related, it would be subject to strict scrutiny. *Id.* And this dichotomy of regulations has been developed to govern what may be done to limit speech in either a traditional public forum or a designated public forum.[9] *See* 4 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 20.47 at 310-11 (2d Ed. 1992). Although it is impossible to state whether a local access channel should be analyzed by reference to the public forum doctrines, the dichotomy of standards seems to apply to broadcast regulations.

The nub of the parties' disagreement turns upon whether the fee charged for non-locally produced programs is content-neutral, or, as N-TV would have it, a ruse for influencing the content of programs that will be cable-cast.

The Supreme Court has observed that "[d]eciding whether a particular regulation is content based or content neutral is not always a simple task." *Turner*, 512 U.S. at 642, 114 S. Ct. at 2459. Regulations that "by their terms distinguish favored speech from disfavored speech on the basis of ideas or views expressed are content based." *Id.* 512 U.S. at 643, 114 S. Ct. at 2459. Thus, a rule that is applied because of disagreement with a message presented or a rule that has a substantial risk of eliminating certain ideas or viewpoints from the public dialogue are content-based. *See id.* 512 U.S. at 642, 114 S. Ct. at 2459; *Clark v.*

---

[9]If Access were, instead, a limited public forum or a nonpublic forum it would be permitted to place reasonable restrictions on the speech of programmers. *See Forbes*, ___ U.S. at ___, 118 S. Ct. at 1640-42. But it plainly does not fit in these categories.

*Community for Creative Non-Violence*, 468 U.S. 288, 295, 104 S. Ct. 3065, 3070 (1984). If, on the other hand, the regulation is justified without reference to the content of the speech or serves purposes unrelated to the content, it is a content-neutral regulation, even if it has an incidental effect on some speakers or messages but not others. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754 (1989); *Boos v. Barry*, 485 U.S. 312, 320, 108 S. Ct. 1157, 1163 (1988). Finally, this court has noted that government regulations that apply evenhandedly to all speakers weigh in favor of finding content-neutrality. *See International Soc'y for Krishna Consciousness of New Orleans, Inc. v. Baton Rouge*, 876 F.2d 494, 497 (5th Cir. 1989).

We conclude that Access's fee rule is content-neutral because the rule does not, by its terms, distinguish between favored speech and disfavored speech. Access does not examine the content or message of submitted programs in determining whether to impose a fee. *Compare Frisby v. Schultz*, 487 U.S. at 474, 481-82, 108 S. Ct. 2495, at 2501 (1988) (finding that a municipal ordinance prohibiting all picketing near a residence was content-neutral because government did not have to look at the content to determine where picketers can demonstrate), *with Boos,* 485 U.S. 312, at 318-19, 108 S. Ct. 1157, at 1162 (1988) (finding that an ordinance prohibiting demonstrations in front of foreign embassies that are critical of the foreign government was content based because government necessarily had to review content to determine the legality of the demonstration). Access's fee regulation is an

10

evenhanded charge on all providers submitting non-locally-produced programming, regardless of the content or viewpoint contained in the program. In addition, the fee rule can be justified without referring to the content of any of the submitted programs. *See Ward*, 491 U.S. at 791, 109 S. Ct. at 2754. As discussed *infra*, Access asserts that the fee rule promotes local ideas and debate and helps fund equipment and training for local producers and the cost of Access's operations. *See id.; Boos*, 485 U.S. at 320, 108 S. Ct. at 1163. Finally, we rely on a Seventh Circuit case that upheld as content-neutral, albeit before *Turner*, a Chicago rule requiring locally-produced programs. *Chicago Cable Comm. v. Chicago Cable Comm'n*, 879 F.2d 1540 (7th Cir. 1989).

To the extent that Access's fee rule unabashedly prefers locally-produced programs, we recognize that it is not unassailable. The dissenters in *Turner* criticized legislative preferences for "diversity of viewpoints, for localism, for educational programming . . ." as content-based regulations. *Turner*, 512 U.S. at 675, 114 S. Ct. at 2476. They noted that no matter how praise-worthy the objectives, government may not favor one set of speakers over another. *See id.* 512 U.S. at 677-78, 114 S. Ct. at 2476-77. Only a four-member plurality in *Turner* directly responded to arguments concerning localism, but the majority opinions emphasized the purely economic reasons why Congress wanted to support local broadcasters by requiring "must-carry" by cable operators. The non-speech-related basis for the rule made it content-neutral. *See id.* 512 U.S. at 645, 114 S. Ct. at 2461.

11

In this case, one may argue that while the interest in "localism" is furthered by the fee rule, not only is there no direct content regulation, but the fee compensates the citizens of Houston in a small way for the costs incurred when non-locally-produced programs air on the Access channel. The fee subsidizes Access and substitutes for the local resources that could otherwise be utilized to produce programs. The fee thus has an independent economic basis more closely analogous to the content-neutral must-carry rule than to a purely content-related localism preference. We therefore conclude that the non-locally-produced fee rule is content-neutral.

The standard for evaluating the constitutionality of content-neutral regulations was articulated in *O'Brien*:

> [A] government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien*, 391 U.S. at 377, 88 S. Ct. at 1679. As Access's fee regulation is on balance a content-neutral rule, the third prong of the *O'Brien* test has been satisfied, and, germane to the first prong, Houston has the power to sponsor a public access cable channel and raise revenues for its operation.

Still at issue are the second and fourth *O'Brien* standards. "Even a content-neutral regulation of speech on a public forum must be narrowly tailored to serve a significant government interest and must leave open ample alternative channels

12

of communication." *Hays County Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992). The burden is on Access to show that the fee requirement is narrowly tailored to protect the identified interests. *See id.* at 119. A regulation is narrowly tailored "when it does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 118 (quoting *Ward*, 491 U.S. at 799, 109 S. Ct. at 2758). In other words, Access must show that the fee requirement promotes a substantial governmental interest that would be achieved less effectively absent the regulation. *See United States v. Albertini*, 472 U.S. 675, 689, 105 S. Ct. 2897, 2906 (1985); *Chicago Cable,* 879 F.2d at 1550.

Access argues that the fee requirement promotes the substantial governmental interest in "localism." According to Access, the fee encourages residents to produce programs featuring topics of local concern which in turn enhances community self-expression and fosters direct communication among residents. Since a portion of the revenues derived from Houston residents' cable bills funds Access's operations, residents should not have to subsidize non-locally-produced programs.[10] Similarly, Access urges

---

[10]At the TRO hearing, the executive director for Access expanded on this theme, testifying that,

> the residents of the City of Houston, through their cable bills, underwrote the costs of the facilitation that our organization provides of putting the programs together, scheduling them and putting them on the cable system. We've never had a problem with where programs come from in terms of content. We frankly don't care about what the content is. What we were concerned about was it seemed unfair to us that the residents of City of Houston should subsidize programs that were from somewhere else and that, if someone wished to

13

that the revenues generated from the fee train local producers, purchase production equipment, and fund the general operations of Access. Finally, encouraging residents to produce local programming increases job opportunities and career development of Houston residents. We agree--and N-TV does not dispute[11]--that the promotion of "localism" in this context is an important governmental interest. *See Chicago Cable*, 879 F.2d at 1549-50.

That Access's asserted interests are substantial in the abstract does not mean, however, that the fee regulation fulfills them and is narrowly tailored to protect those interests. The fee rule will be considered narrowly tailored if Access can demonstrate that it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799, 109 S. Ct. at 2758. According to Access's rules, "locally produced programs" are aired free of charge, while "programs produced elsewhere" are charged either $75 or $100 per hour. Access defines local programming as "[a]ny program submitted for cable-cast containing program material of which fifty (50) percent or greater was shot" within the Houston Standard Metropolitan Statistical Area.

Access has failed to demonstrate narrow tailoring of the fee rule as a matter of law. It has not shown that, absent the fee charged to providers of non-local programs, its interest in

---

use the facilities, that they should contribute to sustaining the organization that had to help facilitate the users of all the programs on the channels.

[11]At oral argument, N-TV agreed that Houston has a substantial interest in promoting localism.

promoting localism "would be achieved less effectively." *Albertini*, 472 U.S. at 689, 105 S. Ct. at 2906. Access has not provided any evidence linking the amount charged to non-local producers and the promotion of localism. More precisely, Access has not shown the amount of revenue generated from the fee, the number of providers who have been charged the fee, or whether the fees have actually helped purchase equipment, train producers, enhance community self-expression, or offset amounts underwritten by Houston cable subscribers. Access acknowledged there is no scarcity of time available for programs, so the fee plays no role in rationing airtime favorably to locally produced programs.

Access's general fee schedule demonstrates the lack of correlation between the amount charged to non-locally produced programs and its stated justification for imposing a fee. Access heavily subsidizes most of the services and equipment it offers to the public. Next to each item listed on the general fee schedule, Access lists the cost of the item, the amount subsidized by Access, and the resulting net cost to the producer.[12] Notably, however, the fees charged to program providers for cable-casting their programs are not itemized by actual cost, amount subsidized, and net cost to provider. The general fee schedule merely states that Access airs locally produced programs free of charge, while programs produced elsewhere are charged either $75 or $100 per hour, depending on

---

[12]For example, the actual cost of renting a "VideoMobile Portable Kit" is $250; however, Access pays $190 of the cost via a grant, leaving the producer liable for only $60. *See Access Houston Cable Corporation's Objections to Proposed Order Granting Summary Judgment*, Exhibit D (fee schedule effective May 19, 1988).

15

whether the provider is an individual or organization. Not only is there no evidence how much of the fee charged for non-locally-produced programs compensates Access for its cable-casting costs of those programs, but Access's executive director testified that he had recommended abolition of the fee to the Board of Directors. The inescapable conclusion is that the fee serves no measurable purpose.

Because Access has not met its summary judgment burden to sustain the fee, this case must be reversed and remanded. *See Turner*, 512 U.S. at 667-68, 114 S. Ct. at 2471-72 (reversed and remanded for further factual development). On remand, Access should prove how much revenue accrues from the fee for non-locally-produced programs, as well as the purposes for which it uses the revenue. If the revenue is minimal -- that is, if it fails to ration scare airtime, to reimburse Access's costs of airing non-locally-produced programs, or to make any realistic dent in the costs borne by cable subscribers for the production facilities -- then the district court may conclude that the fee suppresses protected speech without providing any asserted benefits.

Further judicial efforts would be avoided, however, if we accept N-TV's alternative argument that the fee rule confers excessive discretion upon Access's administrator and permits content-based discrimination. According to N-TV, Access's own interpretation of the fee rule undermines the argument that it is narrowly tailored. *See Forsyth County v. The Nationalist Movement*, 505 U.S. 123, 131, 112 S. Ct. 2395, 2402 (1992) (courts should

16

consider the government's interpretation of a challenged regulation when addressing facial challenges). In *Forsyth County*, the Supreme Court addressed whether a county could constitutionally charge a fee to speakers who wished to hold a rally in a traditional public forum. *See id.* 505 U.S. at 129, 112 S. Ct. at 2400. The Court struck down the ordinance because it vested too much discretion in the county administrator; the administrator could, without objective guidance, determine how much or whether to charge the demonstrators a permit fee of up to $1,000. *See id.* 505 U.S. at 132-33, 112 S. Ct. at 2402-03. In the present case, the Executive Director of Access felt that he could independently determine whether to charge a fee for certain non-locally-produced programs. During the TRO hearing, the following exchange occurred between Appellants' attorney and Access's Executive Director:

Question: What about a guy that stopped by the other day and just happened to pick up some of your material and the receptionist was there and I said, "You know, what if somebody wanted to go up and get an interview in Dallas with Ross Perot, shoot it up there" and she said, "That will be all right?" Would that be okay with you?

Answer: It would be okay with me.

Question: No charge for that?

Answer: No charge.

Question: Okay. Now, just assume for a moment that here is a tape and we're showing it and there is Senator Gramm. He's seated at a desk. There's books behind

17

> **him. And he's sitting there talking about taxes. Everybody is concerned about them these days. Any problem putting that on?**
>
> **Answer: No.**
>
> **Question: Okay. Now, let's say that it's on the air and one of your staff comes in and says "Mr. Cantrell, you know, I've been in Senator Gramm's office in Washington and I recognize those books. That was filmed in his office in Washington." No real problem, though?**
>
> **Answer: No real problem.**

**Other similar exchanges occurred during the TRO hearing, each one suggesting that Access's administrator could, at his discretion, make special exceptions to the fee rule depending upon the circumstances presented.[13] The discretion afforded the Executive Director is highlighted by contrasting the hypothetical above with**

---

[13]For instance, in another exchange, Access's Executive Director testified as follows:

```
Counsel:  Let's say that Mr. Horton comes into your
          studio and he produces a show right there
          in your studio every week, free.  He goes
          to Mississippi.  He's over there visiting
          the headquarters [of N-TV] and everything
          and the poor fellow is in a car wreck and
          he broke his leg and he calls you up and
          says, "I can't get back to Houston.  I'm
          going to have to shot this from the
          hospital bed in Jackson" and he sends you
          the tape.  Is he going to have to pay for
          that?
Answer:   Under the Current rules, that would be the
case.
Counsel:  Would you waive that in this case?
Answer:   Would I waive it?
Counsel:  Yes
Answer:   In the grievance procedure, I would
          recommend that we waive it.  I would
          probably take it upon myself to waive it.
```

one presented to him later during the TRO hearing:

> Question:   [Suppose] [h]e's got a 30-minute show.  He comes so close.  for 14 minutes he shows the Houston skyline.  Would you let him slide on that without having to pay?
>
> Answer:   Like I say, we would -- that would be a good issue to discuss in the grievance procedure.
>
> Question:   You might let it slide?
>
> Answer:   Well, I don't think I would let it slide.  But if it came up, I think it would be something worth discussing with the board.

Access's response to this troubling amount of apparently unguided discretion is that N-TV presented no actual evidence that the fee had been discriminatorily imposed.  We agree that, in light of the express objectivity of the rule, a facial challenge based on standardless discretion lacks merit.  The rule, unlike the sliding-scale fee in *Forsyth*, unequivocally identifies the programs to which it applies and simply does not justify the latitude which the Executive Director hypothesized.  Further, lacking any proof that the fee was ever administered discriminatorily to suppress disfavored speech, N-TV's as-applied challenge must fail.

CONCLUSION

Much is uncertain about the scope of First Amendment benefits and burdens in the cable industry.  The directions presently available to us from the Supreme Court appear to require a standard less than that of strict scrutiny for Access's non-

19

locally-produced fee rule, but they also require attention to the details of intermediate scrutiny.  Regulations like this one which burden protected speech are not to be rubber-stamped.  Based on the foregoing discussion, the case must be reversed and remanded for further factual development.

**REVERSED and REMANDED**.